**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

Wendy Keirsted, on Behalf of Herself and All Others Similarly Situated,

Plaintiff,

vs.

KETTLE and FIRE, a Texas Corporation,

Defendant.

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff, Wendy Keirsted ("Plaintiff"), by and through her attorneys, brings this action on behalf of herself and all others similarly situated against Defendant Kettle & Fire ("Defendant"). Plaintiff hereby alleges, on information and belief, except for information based on personal knowledge, which allegations are likely to have evidentiary support after further investigation and discovery, as follows:

## INTRODUCTION

1. Nick Mares and Justin Mares started Kettle & Fire in August 2015, touting the benefits of bone broth - collagen, gelatin, and other amino acids.

2. Kettle & Fire manufactures and markets bone broth and soups. Its product offerings include beef bone broth, mushroom chicken bone broth, chicken bone broth, tomato soup, butternut squash soup, Thai curry soup, beef chili soup,

Case 6:25-cv-02037 Document 1 Filed 10/21/25 Page 2 of 20 PageID 2

and miso soup. Its products are sold in stores and can also be purchased online through the website.

3. A key selling point for bone broth is the amount of protein per carton. Protein is an essential macronutrient that plays a crucial role in the growth, repair, and maintenance of body tissues. Beyond muscle building, protein is involved in various physiological processes that contribute to overall health and well-being. With emerging research highlighting the benefits of adequate protein intake, understanding its importance can help individuals make informed decisions about their diet.

4. Defendant Kettle & Fire misled Plaintiff and Class Members into believing that a carton of its Classic Organic Chicken Bone Broth ("Product") contains 19 grams of protein. These claims are false and misleading.

5. Cartons of Kettle & Fire are sold at 22,000 stores nationwide, from Whole Foods to Walmart and Target, as well as on its own website and at Amazon, Walmart.com, and more.

6. Plaintiff and members of the classes purchased the Product for their ingredients, potency, and effects, and paid a premium for Defendant's Product over comparable products that were not promoted with the misrepresentations at issue here.

Case 6:25-cv-02037 Document 1-1 Filed 10/21/25 Page 3 of 20 PageID 3

7. Plaintiff and the Class suffered economic injury as a direct and proximate result of Defendant's violation because: (a) they would not have purchased the Product on the same terms if they had known that the Product did not contain the amount of protein Defendant affirmatively stated; (b) they paid a price premium compared to products without the misrepresentation alleged herein; and (c) the Products did not have the characteristics, ingredients, uses, benefits, or quantities as promised.

8. Defendant's representations concerning the Product are unfair, unlawful, and fraudulent, and have the tendency or capacity to deceive or confuse reasonable consumers. As such, Defendant's practices violate Florida's Deceptive and Unfair Trade Practices Act, § 501.201, et seq. ("FDUTPA").

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this matter under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), as the amount in controversy exceeds $5 million, exclusive of interests and costs; it is a class action of over 100 members; and the Plaintiff is a citizen of a state different from at least one Defendant. Plaintiff alleges that the total claims of individual members of the proposed Classes (as defined herein) are well in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs.

Case 6:25-cv-02037 Document 1 Filed 10/21/25 Page 4 of 20 PageID 4

10. This Court has personal jurisdiction over Defendant. Defendant has sufficient minimum contacts with the state of Florida and purposefully availed itself, and continues to avail itself, of the jurisdiction of Florida through the privilege of conducting its business ventures in the state of Florida, thus rendering the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.

11. Venue is proper in this district under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district, as Defendant does business throughout this district, and Plaintiff made her purchase of the Goli Product in this district and her purchased Product was delivered to, and used, in this district.

## THE PARTIES

12. Plaintiff, Wendy Keirsted, is a natural person and a citizen of Brevard County, Florida, residing in Titusville, Florida. In or around May 2025, Plaintiff purchased the Kettle & Fire Chicken Bone Broth manufactured by Defendant from Publix. When Ms. Keirsted made her purchase, she believed that the Product contained a heightened amount of protein because she saw that the Bone Broth Product was labeled as containing 19 grams of protein per serving on the packaging. Plaintiff saw this representation prior to, and at the time of purchase, and relied on the misleading representation in purchasing the Bone Broth Product. The Product

Ms. Keirsted purchased included a representation that the product contained 19 grams of protein per serving on the packaging. The protein content was material to Plaintiff, and had she known that the protein content was significantly lower than the represented 19 grams, she would not have purchased the Product or would have paid significantly less for it.

13. Defendant, Kettle & Fire, is a Texas corporation with its principal place of business in Austin, Texas. Defendant is licensed to conduct business in Florida.

14. Plaintiff reserves the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendant who has knowingly and willfully aided, abetted, or conspired in the false and deceptive conduct alleged herein.

**FACTUAL ALLEGATIONS**

15. Defendant manufacturers, distributes, advertises, and sells the bone broth Product, which for all relevant purposes is identical. At all relevant times, Defendant has marketed the Product in a consistent and uniform manner regarding the ingredients. Defendant sells the Product on its website and through various distributors.

16. Bone broth (made from simmering chicken or beef bones) can be a good source of protein, particularly collagen. Bone broths have been promoted for boosting the immune system, healing the digestive tract, building muscle, reducing

joint pain, increasing bone mineral density, improving skin elasticity, reducing wrinkles, and strengthening nails. The protein in bone broth (including the collagen) significantly contributes to one's daily requirement for protein and provides essential amino acids after digestion.

17. Defendant claims that its Classic Chicken bone broth Product contains 19 grams of protein. The claim is prominent on the front and/or back of every carton of Kettle & Fire bone broth at issue and is false.

**A. PROTEIN AND BONE BROTH**

18. Protein helps build and repair cells and body tissues, supports immune responses, maintains fluid balance, aids vision, assists in hormone production, and contributes to antibodies and enzymes. Protein is an essential macronutrient for overall health, muscle growth, bodily maintenance, and function. Protein builds and repairs cells and body tissue, promotes immune responses, fluid balance, vision, hormone production, antibodies, and enzymes.[1]

19. The American Heart Association suggests that protein should account for 10% to 35% of one's daily caloric intake.[2] This means that someone who consumes 2,000 calories a day should consume 50-175 grams of protein per day.[3]

---

[1] FDA *Nutrition Facts Sheet – Protein* https://www.accessdata.fda.gov/scripts/InteractiveNutritionFactsLabel/assets/InteractiveNFL_Protein_October2021.pdf

[2] *Protein: What's Enough?* American Heart Association (last updated Aug. 28, 2024), https://www.heart.org/en/healthy-living/healthy-eating/eat-smart/nutrition-basics/protein-and-hearthealth#:~:text=How%20much%20protein%20do%20you,daily%20calories%20come%20from%20protein.

[3] FDA *Nutrition Facts Sheet – Protein*

Case 6:25-cv-02037 Document 1 Filed 10/21/25 Page 7 of 20 PageID 7

20. Although most Americans may meet the recommended daily protein intake through the consumption of meat, dairy, beans, and nuts, many rely on additional sources of protein, such as bone broth, to achieve their protein intake goals.

21. For these reasons, bone broths have boomed in popularity. From fitness influencers using it to support muscle growth to Defendant's own 21-day bone broth diet plan,[4] bone broth has been hailed as a quality source of protein.

22. Bone broth forms a stock often used for making soups, sauces, and gravies. It can also be consumed as a drink. Aside from its flavor, bone broth provides essential nutrients, including minerals, derived from animal tissues. The bone broth industry is expected to generate over $250 million in 2025.[5]

23. Defendant benefits from charging a substantial price premium for its Products. For instance, other bone broth products on the market, which claim to have less protein, retail for significantly less than the Product Plaintiff purchased.

---

https://www.accessdata.fda.gov/scripts/InteractiveNutritionFactsLabel/assets/InteractiveNFL_Protein_October2021.pdf.

[4] https://www.kettleandfire.com/pages/the-bone-broth-diet?srsltid=AfmBOop4HI5_LzTV7ux9vFvORUv3gkZAT_hMMEFB30YLF6UXAu_GHBQd

[5] *See Bone Broth Market Size, Share, Growth, and Industry Analysis, By Type (Powder, Liquid, Tablet, and Bars), By Application (Fortified Foods, Fortified Beverages, Dietary Supplements, and Pharmaceuticals), and Regional Forecast to 2033*, BUSINESS RESEARCH INSIGHTS (last updated June 26, 2025), https://www.businessresearchinsights.com/market-reports/bone-broth-market-119047.

**B. DEFENDANT'S PRODUCT CONTAINS LESS PROTEIN THAN STATED**

24. Defendant represents on the front of the package and in the nutrition facts of the packaging that its Organic Classic Chicken Broth Product contains 19 grams of protein per serving.



25. Unfortunately for the Plaintiff and similarly situated consumers, however, this is not the case. In September 2025, independent third-party testing by ConsumerLab (an organization that tests consumer product claims) tested the protein claims of Defendant's 16.9 oz (500ml) Chicken Bone Broth Product. ConsumerLab's independent lab testing analyzed total protein by combustion and collagen calculated from hydroxyproline by High Performance Liquid Chromatography (HPLC).

26. ConsumerLab's testing found the Kettle & Fire Classic Chicken Bone Broth contained only 14.6 grams of protein per 500 mL carton (7 grams per cup) — just 76.7% of its claimed 19 grams.[6] According to ConsumerLab, these results were confirmed by a second laboratory.

### C. DEFENDANT'S PRODUCT IS MISBRANDED

27. Under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 343, a food product is misbranded when its labeling is false or misleading. As such, a product that overstates the amount of protein in its Nutrition Facts Panel is misbranded within the meaning of 21 U.S.C. § 343(a)(1).[7] FDA regulations implementing this provision require that the declared amount of protein reflect the

---

[6] Mark L. Anderson, Ph.D., *Bone Broth Review: How Products Were Evaluated*, Consumer Lab, https://www.consumerlab.com/methods/bone-broth-review/bonebroth/.

[7] Plaintiff does not ground her claims on violations of FDA regulations. Her claims are based on violations of FDUTPA.

actual content of the product and meet minimum accuracy standards. *See* 21 C.F.R. § 101.9(g).

28. Specifically, 21 C.F.R. § 101.9(g)(4)(ii) provides that for nutrients such as protein, the actual amount in the product must be no less than 80 percent of the value declared on the Nutrition Facts label. If laboratory analysis shows that the protein content falls below this threshold, the food is deemed misbranded. Defendant's Products fail to meet these requirements because the actual protein content is materially lower than the amount stated on the Nutrition Facts label. Defendant's Products' labels, which Plaintiff and Members of the Classes reviewed and relied on when making their purchases, materially overstate the protein content in the Nutrition Facts Panel and fail to comply with applicable federal regulations. As a result, the Product is misbranded under federal law.

29. Florida law also expressly prohibits false or misleading food labeling. Florida's Food Safety Act provides in pertinent part that "[a] food is misbranded if its labeling is false or misleading in any particular." Fla. Stat. § 500.11(1)(a). Fla. Stat. § 500.02. Florida's food labeling laws are required to be in conformity with the Federal Food, Drug, and Cosmetic Act, including federal regulations in Title 21 of the Code of Federal Regulations, as required by Fla. Stat. § 500.02 and implemented through the rulemaking authority under Fla. Stat. § 500.09(3). Florida Administrative Code Rule 5K-4.002 explicitly incorporates and adopts Title 21, Part

Case 6:25-cv-03037 Document 1 Filed 10/22/25 Page 11 of 20 PageID 11

101, CFR (Food Labeling) as part of Florida's rules under Chapter 500, F.S. ("Florida Food Act").

30. Defendant's misleading and deceptive practices proximately caused harm to Plaintiff and the Class Members who suffered an injury in fact and lost money as a result of Defendant's wrongful conduct. Damages can be calculated through expert testimony at trial.

**D. DEFENDANT'S MISREPRESENTATIONS INJURED PLAINTIFF AND CLASS MEMBERS**

31. Defendant's misleading and deceptive practices proximately caused harm to Plaintiff and the Class Members who suffered an injury in fact and lost money as a result of Defendant's wrongful conduct.

32. Defendant's Products do not contain, or risk not containing, the represented quantity of protein. Therefore, Defendant's representations are false and misleading and consumers, like Plaintiff, were injured.

33. The amount of protein in the Products is material to consumers. It should come as no surprise that "'consumers often rely on claims for health-related information, and this information can affect their evaluations and choices.'"[8]

---

[8] Lucas Cuni-Mertz, et al., *How Consumers Are Swayed By Products' Nutrient Content and Processing Claims*, UNIV. OF ARKANSAS, SAM M. WALTON COLLEGE OF BUS. (Nov. 15, 2021) *available* https://walton.uark.edu/insights/posts/howconsumers-are-swayed-by-products-nutrient-content-and-processing-claims.php.

34. This is underscored by consumer research specific to protein claims. "According to an Innova Market Insights … global survey in 2022, 1 in 5 consumers said they changed their protein intake in the past 12 months, with 17% seeking high-protein products. Protein is now a key selling point. Innova reported a 10% compound annual growth rate in the number of food and beverage new-product launches making protein claims in 2017-2022."[9]

35. This trend is particularly true for bone broth products. As Bluebird Provisions, a producer of bone broth products explained, "bone broth protein shakes have become increasingly popular among health-conscious consumers due to their numerous health benefits."[10] By way of example, during the COVID-19 pandemic, the bone broth market "witnessed a spike in the demand for animal protein-infused products, which boosted the demand for bone-based broths. Thus, to maintain immunity and overall health status, bone-based broths were consumed at a higher level in the pandemic phase."[11] Bone broth has remained a consistent part of health-conscious, protein-focused diets.

---

[9] Jennifer Grebow, *Protein Attracts New Customers: 2023 Ingredient Trends for Food, Drinks, Dietary Supplements, and Natural Products*, NUTRITIONAL OUTLOOK (Jan. 25, 2023) https://www.nutritionaloutlook.com/view/protein-attractsnew-customers-2023-ingredient-trends-for-food-drinks-dietary-supplements-andnatural-products.

[10] Connor Meakin, *Bone Broth Market Size,* BLUEBIRD PROVISIONS, https://bluebirdprovisions.co/blogs/news/bone-broth-marketsize#:~:text=Growth%20in%20Bone%20Broth%20Protein%20Market,increasingly%20turning%20to%20nutritional%20supplements.

[11] *Bone Broth Market Size, Share & COVID 19 Impact Analysis, By Type (Chicken, Beef, Turkey, and Others), Distribution Channel [Foodservice and Retail (Supermarkets/Hypermarkets, Specialty Stores, Online Retail and Others)], and Regional Forecast, 2023-2030*, FORTUNE BUSINESS INSIGHTS, https://www.fortunebusinessinsights.com/bone-broth-market-106041.

36. Given consumers' interest in protein-emphasized products, Defendant sought to capitalize on this desire by representing to consumers that its Product was a good source of protein. Consumers lack the ability to test or independently ascertain or verify whether the Products contain the proper levels of protein Defendant claims. Consumers rely on Defendant to truthfully and honestly report the protein content of the Product on the packaging.

37. However, when consumers examine the Product packaging, they are led to believe that it contains significantly more protein than it actually does, due Defendant's representations.

38. Defendant's misleading protein claim caused consumers to pay a price premium for its Product. While Defendant sells its Product for approximately $8.09 per 16.9 fl. oz. carton ($3.84 per cup) based on a purported 19 grams of protein per serving, independent testing shows it contains only 14 grams. Comparable chicken bone broths—such as Kirkland Signature ($0.96 per cup, 9g protein per cup) and Pacific Organic ($1.36 per cup, 9g protein per cup)—are sold at significantly lower prices. Absent Defendant's false and misleading representation that its product delivers nearly twice the protein content of competing broths, consumers would not have paid this inflated price or would have purchased a less expensive alternative.

Case 6:25-cv-02087 Document 1 Filed 10/22/25 Page 14 of 20 PageID 14

## CLASS ACTION ALLEGATIONS

39. **Class Definition:** Plaintiff brings this class action on behalf of herself, and as a class action on behalf of the following putative classes (the "Class"):

**Nationwide Class:**

All individual residents of the United States who purchased the Organic Chicken Bone Broth Product through the date of class certification. Excluded from the Class are: (1) Defendant and all directors, officers, employees, partners, principals, shareholders, and agents of Defendant; (2) Any currently sitting United States District Court Judge or Justice, and the current spouse and all persons within the third-degree of consanguinity to such judge/justice; and (3) Class Counsel.

**Florida Sub-Class:**

All individual residents of the State of Florida who purchased the Organic Chicken Bone Broth Product through the date of class certification. Excluded from the Class are: (1) Defendant and all directors, officers, employees, partners, principals, shareholders, and agents of Defendant; (2) Any currently sitting United States District Court Judge or Justice, and the current spouse and all other persons within the third-degree of consanguinity to such judge/justice; and (3) Class Counsel.

40. Plaintiff reserves the right to amend the Class definitions if further investigation and discovery indicates that the Class definitions should be narrowed, expanded, or otherwise modified.

41. **Numerosity and Ascertainability:** Plaintiff does not know the exact number of members of the putative classes. Due to Plaintiff's initial investigation, however, Plaintiff is informed and believes that the total number of Class members is at least in the tens of thousands, and that members of the Class are numerous and geographically dispersed throughout the United States and Florida. While the exact number and identities of the Class members are unknown at this time, such information can be ascertained through appropriate investigation and discovery, including Defendant's records, either manually or through computerized searches.

42. **Typicality and Adequacy:** Plaintiff's claims are typical of those of the proposed Class, and Plaintiff will fairly and adequately represent and protect the interests of the proposed Class. Plaintiff does not have any interests that are antagonistic to those of the proposed Class. Plaintiff has retained counsel competent and experienced in the prosecution of this type of litigation.

43. **Commonality:** The questions of law and fact common to the Class members, some of which are set out below, predominate over any questions affecting only individual Class members:

a. whether the Product contained the stated amount of Protein;

b. whether Defendant's conduct constitutes the violations of laws alleged herein;

c. whether Defendant's labeling, sale and advertising set herein are unlawful, untrue, or are misleading, or reasonably likely to deceive;

d. whether the Product is adulterated and/or misbranded under Florida and/or federal law;

e. whether Defendant knew or should have known that the representations were false or misleading;

f. whether Defendant knowingly concealed or misrepresented material facts for the purpose of inducing consumers into spending money on the Product;

g. whether Defendant's representations, concealments and non-disclosures concerning the Product are likely to deceive the consumer;

h. whether Defendant's representations, concealments and non-disclosures concerning the Product violate the Florida Deceptive and Unfair Trade Practices Act;

j. whether Plaintiff and the Class are entitled to restitution and damages.

43. **Predominance and Superiority:** Common questions, some of which are set out above, predominate over any questions affecting only individual Class members. A class action is the superior method for the fair and just adjudication of this controversy. The expense and burden of individual suits make it impossible and

impracticable for members of the proposed Class to prosecute their claims individually and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues. A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

a. given the complexity of issues involved in this action and the expense of litigating the claims, few, if any, Class members could afford to seek legal redress individually for the wrongs that Defendant committed against them, and absent Class members have no substantial interest in individually controlling the prosecution of individual actions;

b. when Defendant's liability has been adjudicated, claims of all Class members can be determined by the Court;

c. this action will cause an orderly and expeditious administration of the Class claims and foster economies of time, effort and expense, and ensure uniformity of decisions; and

d. without a class action, many Class members would continue to suffer injury, and Defendant's violations of law will continue without redress while Defendant continues to reap and retain the substantial proceeds of their wrongful conduct.

44. **Manageability:** The trial and litigation of Plaintiff's and the proposed Class claims are manageable. Defendant has acted and refused to act on grounds generally applicable to the Class, making appropriate final injunctive relief and declaratory relief with respect to the Class as a whole.

**COUNT I**

**For Violations of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. 501.201 et seq.**

45. Plaintiff realleges and incorporates by reference each of the allegations contained in the paragraphs above as if fully set forth herein.

46. Plaintiff brings this claim on her own behalf and on behalf of each member of the Class.

47. Defendant violated and continues to violate Florida's Deceptive and Unfair Trade Practices Act by engaging in unfair methods of competition, unconscionable acts and practices, and unfair and deceptive acts and practices in the conduct of their business.

48. The material misstatements and omissions alleged herein constitute deceptive and unfair trade practices, in that they were intended to and did deceive Plaintiff and the general public into believing that Defendant's Product contained 19 grams of protein when it did not.

49. Plaintiff and Class members relied upon these advertisements in deciding to purchase the Product. Plaintiff's reliance was reasonable because of Defendant's reputation as a reliable company.

50. Had Plaintiff known that the Product was not as advertised, she would not have purchased it. As a result of Defendant's deceptive and unfair acts, Plaintiff and Class members have been damaged.

51. Defendant's conduct offends established public policy, and is immoral, unethical, oppressive, and unscrupulous to consumers.

52. Plaintiff and Class members are entitled to damages in an amount to be proven at trial.

53. Defendant should also be ordered to engage in a corrective advertising campaign to inform consumers that its Product is not of the quality advertised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays this Court:

a. Certify this action as a class action;

Case 6:25-cv-0568-3037 Document 1 Filed 10/21/25 Page 20 of 20 PageID 20

b. Award compensatory, statutory, and punitive damages as to all Counts where such relief is permitted by law;

c. Order Defendant to engage in a corrective advertising and labeling/disclosure campaign;

d. Award equitable monetary relief, including restitution or refund;

e. Award pre-judgment and post-judgment interest at the legal rate;

f. Award Plaintiff and Class members the costs of this action, including reasonable attorneys' fees, costs, and expenses; and

g. Award such other and further legal and equitable relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

DATED: October 22, 2025

s/William C. Wright
WILLIAM WRIGHT
The Wright Law Office
FL Bar No. 138861
Kelly Mata
515 N. Flagler Drive, Suite P-300
West Palm Beach, FL 33410
Telephone: (561) 514-0904
willwright@wrightlawoffice.com
kellymata@wrightlawoffice.com